IN THE COURT OF CRIMINAL APPEALS OF TENNESSEE
AT NASHVILLE
February 13, 2018 Session

## CHRISTOPHER M. HOOTEN v. STATE OF TENNESSEE

**Appeal from the Circuit Court for Maury County**
**No. 19949, 19679    Robert L. Jones, Judge**

_____

### No. M2017-00122-CCA-R3-PC

_____

Petitioner, Christopher M. Hooten, appeals the denial of his petition for post conviction relief from his convictions of first degree premeditated murder, first degree felony murder, aggravated robbery, and tampering with evidence. On appeal he contends that he received ineffective assistance of counsel. Petitioner also appeals the denial of his petition for writ of error coram nobis based upon newly discovered evidence. After thoroughly reviewing the record and applicable authorities, we affirm the post-conviction court's judgment.

**Tenn. R. App. P. 3 Appeal as of Right; Judgment of the Circuit Court Affirmed**

THOMAS T. WOODALL, J., delivered the opinion of the court, in which ROBERT W. WEDEMEYER and TIMOTHY L. EASTER, JJ., joined.

Joshua D. Miller, Columbia, Tennessee, for the appellant, Christopher M. Hooten.

Herbert H. Slatery III, Attorney General and Reporter; Clark B. Thornton, Senior Counsel; and Brent A. Cooper, District Attorney General, for the appellee, State of Tennessee.

### OPINION

*BACKGROUND*

On direct appeal, this court summarized in part the following testimony from the suppression hearing:

> Scott McPherson, a Columbia Police Department officer, testified that at
> around midnight on March 6, 2010, he received a dispatch to be on the

look out ("BOLO") for assault suspects to be detained for investigation. The possible suspects were thought to be driving "a maroon square body style Cadillac, occupied by two white males." Officer McPherson said that he patrolled the area near the crime scene looking for a vehicle consistent with the radio dispatch.

Officer McPherson testified that he spoke with Officer Steve Ellis and learned of a residential address on Bandywood Drive where a car matching the description might be found. Officer McPherson proceeded to the address and did not see any vehicle matching the description. As he was leaving the area, he observed a vehicle matching the dispatch description driving toward Bandywood Drive. Officer McPherson turned his vehicle around and observed the Cadillac turning onto Bandywood Drive. Officer McPherson followed the vehicle onto Bandywood Drive, where the vehicle parked in the driveway of a residence. Officer Ellis was also on Bandywood Drive at the time of the stop and assisted Officer McPherson.

Officer McPherson said that he shined his spotlight into the Cadillac and saw two men. He said that he recognized the Defendant, the driver, from "previous dealings." Officer McPherson proceeded to conduct a "felony stop" by ordering the two occupants out of the car at gunpoint. The State played portions of a video recording of the stop. Officers patted down the Defendant, and then handcuffed him and placed him in the back of Officer Ellis's patrol car. The same procedure was followed with the passenger, Marvin Kelley, who was placed in Officer McPherson's patrol car. Officer McPherson explained the procedure for a felony stop was to detain the suspects until a detective arrived. Officer McPherson recalled that it took approximately an hour for Detective Reed to arrive.

Officer McPherson testified that he advised the Defendant of his *Miranda* rights twice. The Defendant responded to the officer that he understood his rights and knew his rights. After the second time the Defendant was advised of his rights, Officer Ellis spoke with the Defendant. The Defendant stated that he had been at a friend's house and that "they" had been "looking for drugs." Officer McPherson said that the Defendant never indicated that he wished to invoke his rights.

Steve Ellis, a Columbia Police Department officer, testified similarly to Officer McPherson about the events leading up to the stop. Officer Ellis said that he had known the Defendant for over twenty-two years and recognized him as the driver of the Cadillac. Officer Ellis estimated that the stop was conducted thirty to forty minutes after the BOLO was

issued. The Defendant was placed in the back seat of Officer Ellis's car and advised of his *Miranda* rights. Based upon his prior relationship with the Defendant, Officer Ellis attempted to speak with the Defendant. The Defendant asked about the stop and "what was going on." Ellis described this interaction as follows:

> After initially speaking to [the Defendant], right after being Mirandized, several minutes [went] by. I went back to my car, and opened the back door and—and just tried to talk to him, you know, since we were acquaintances.
> I asked him, . . . "You know, it's me. You know, anything you wanted to say, you know, now would be the time to do it."
> And . . . [Officer] McPherson had kind of filled him in a little bit on what had gone on at the Wayside Inn, you know, told him somebody had been injured pretty severely.
> And . . . that second time talking to [the Defendant], he looked up and . . . he said, "Is he dead?"
> And—and of course, I told him, I said, "You know, . . . I don't know. You know I hadn't been [to the Wayside Inn] and I hadn't heard anything about that."
> And somewhere closer to—right after him saying that, you know, I kind of felt like he was going to open up and—and talk to me.
> And then [Officer] McPherson opened the front seat of my car and leaned in with his . . . mic and . . . laid it on my—on the screen. And I think, you know, [the Defendant] saw that and [ ] then, he said, "No, sir. I'm done talking to you."

Officer Ellis testified that, other than taking the Defendant "to the bathroom" two times, he and the Defendant did not speak about the case again. Officer Ellis said that the Defendant never requested an attorney.

Officer Ellis testified that he spoke with Detective Reed when he arrived and informed the detective that both the Defendant and Kelley had been issued *Miranda* rights.

On cross-examination, Officer Ellis agreed that, when speaking with the Defendant that night, the Defendant said, "I'm done. I'm done." Officer Ellis said that he interpreted this to mean that the Defendant was finished talking to him. He did not interpret this statement as the Defendant invoking his right to remain silent or requesting an attorney. Officer Ellis explained that because the Defendant's statement came after he observed Officer McPherson place a recording device in the car, Officer Ellis believed the Defendant meant that he did not want to be recorded.

- 3 -

Jamie Reed, a Columbia Police Department detective, testified that he arrived at the Wayside Inn at approximately 12:46 a.m. on March 6, 2010. When he arrived, officers on the scene told him that the victim's injuries were life-threatening and that the victim was not expected to survive. Based upon this information, Detective Reed treated the area as a major crime scene. Detective Reed was in the middle of processing the scene when he learned that the suspects had been detained. Detective Reed testified that he made an effort to get to the location where the suspects were detained, Bandywood Drive, as quickly as possible while maintaining the integrity of the investigatory process at the scene. Detective Reed said that he arrived at Bandywood Drive at 1:38 a.m.

Detective Reed testified that, upon his arrival at Bandywood Drive, he spoke with the officers present and learned that each defendant had been advised of his rights. He said that, because he knew the Defendant "personally," he proceeded to the police car where the Defendant was sitting to speak with him. Detective Reed confirmed with the Defendant that he had been read his *Miranda* rights, and the Defendant said that he understood his rights. The detective then asked the Defendant for permission to search his vehicle. The Defendant responded that police could search the vehicle if he was allowed to stand beside the car during the search. Detective Reed said that he allowed the Defendant to observe the search. After a bloody shoe was found in the trunk of the car, the Defendant said, "Okay, how about this, how about I invoke my rights." Detective Reed said that, based on this statement, police discontinued the search and placed the Defendant back in the patrol vehicle.

Detective Reed testified that he obtained a search warrant for the Cadillac, and police continued the search of the car at the police impound lot. He said the car was registered in the Defendant's name.

*State v. Christopher Michael Hooten*, No. M2012-00979-CCA-R3-CD, 2013 WL 5436712, at *1-2 (Tenn. Crim. App. Sept. 27, 2013).

On direct appeal, this court further summarized the facts presented at trial:

James Harold Clemons, the victim's father, testified that his son was born and raised in Arkansas. He estimated that the victim had moved to Tennessee with his wife six or seven years earlier. The victim and his wife had one child together. The couple divorced, but the victim remained in Tennessee. Clemons recalled that, when he learned of his

son's admission to Vanderbilt Hospital related to this incident, he immediately drove to Nashville. He described for the jury seeing the victim in the trauma unit. "It didn't even look like my son. His face and his head was about this big around (indicating). He had tubes everywhere, he couldn't—he was basically dead." The victim was not responsive, so he was unable to communicate with the victim. Clemons said that he remained with his son at the hospital until his son's death the following day.

April Drew, the victim's ex-wife, testified that she and the victim divorced in 2007 when their daughter was approximately two and a half years old. Drew said that, after the divorce, the Defendant remained active in his daughter's life. Drew acknowledged that the victim drank "a beer or two occasionally" but said that she had never known him to use illegal drugs. Drew said that the victim always carried, in his front, left pants pocket, "a little plastic thing for photos" and his money in a clip. She said that the victim suffered from back pain and kept Lortab and an anti-inflammatory on his person at all times. The victim also took a medication for depression. She said that he carried those medications in a "kidney shaped pill container" in his pocket. Drew identified the victim's pill container in a photograph of a pill container found near the victim at the crime scene.

Drew testified that the victim spent the night before this incident at her home with their daughter. She described him as "happy" and playing "beauty shop" with their daughter. The following morning, they ate breakfast together, and then, at around noon, she drove the victim "home." Drew recalled that the victim called her on the telephone at around 5:00 p.m. to invite her out for a drink, but she was unable to go. The following day, Drew received a phone call from one of the victim's roommates asking if Drew had seen the victim. Drew said that she became concerned upon learning that the victim had not returned to his home the previous night. She had heard about an unidentified man being air-lifted to Vanderbilt Hospital for treatment, so she began seeking the identity of that man. Ultimately, she went to Vanderbilt Hospital and identified the victim for police. She described the victim's eyes as black and his head and face as severely swollen.

Sandra Ragsdale testified that the victim had rented a room in her home for approximately two years. Ragsdale described the victim as a "very good tenant" and as "respectful" toward her. Ragsdale recalled that, on the day of these events, the victim had been drinking "a little bit." He wanted to go out to a bar, and Ragsdale attempted to convince him to

stay at home instead. When the victim persisted, Ragsdale gave him her cellular phone to carry with him in case he needed someone to pick him up. Ragsdale identified the cellular phone that she provided the victim that night. Later that night, Ragsdale attempted unsuccessfully to contact the victim by phone. When the victim did not answer the phone, she grew concerned. She said that the victim did not drink frequently, and it was unlike him to not call and let her know he was okay. Ragsdale said that she did not see her cellular phone again until she was in court.

Mark Dugger testified that he rented a room from Ragsdale during the time the victim lived in the home. [Dugger] said that, on the day of these events, he drove the victim to the store to buy beer. [Dugger] observed the victim counting his money, approximately $100.00, before he purchased the beer. The two men returned to the house where the victim drank beer and grilled. Later that evening, the victim went to a bar. [Dugger] said that he called the victim at around 9:30 p.m. to see if the victim needed a ride home, but the victim did not answer the phone. [Dugger] called the cellular phone a few times more before going to bed, but the calls were unanswered. The next morning, [Dugger] began placing phone calls to the jail, hospital, and friends in an attempt to find the victim. Dawn Scribner testified that the last time she saw the victim was at a cookout at Ragsdale's house. After eating, the victim asked Scribner to drive him to Huck's Bar and Grill, and Scribner agreed. Scribner recalled that the victim had "around $70.00," and she gave him an additional $20.00 "in case he [ ]need[ed] to eat."

Robert Reed testified that he did not know the victim or the Defendant. He said that, on the night of March 6, 2010, he had a "few beers" at the Wayside Inn and then went "out back" to his friend's motor home to lay down on the couch. As he was lying on the couch, he heard a commotion outside. He opened the door to the motor home and saw a man lying on the ground, who was bleeding from his ears and head. Reed described the man as lying on his side and "gurgling." Reed looked around and saw two men, one "large" and the other "small," walking away from him and toward an "early model ′90s" burgundy Cadillac. Reed said that he went back inside the motor home, put on his boots, and then walked to the Wayside Inn to have someone call 9-1-1. He then returned outside to check on the man lying on the ground. He said that the men who had been walking toward the Cadillac were "long gone" by the time he returned outside.

- 6 -

Bill Denton, a Columbia Police Department officer, testified that he was supervising the third shift on March 6 and 7, 2010. He responded to a call from the Wayside Inn where a man had been found lying on the ground. Lieutenant Denton described for the jury the computer-aided dispatch ("CAD") system employed at the police department to log and track dispatch calls and police response. He identified the CAD report from the Wayside Inn call. The lieutenant testified that the report showed that the first unit was dispatched at 11:55 p.m. Lieutenant Denton said that he arrived on the scene at 11:58 p.m., and the victim was transported to the hospital by 12:36 a.m. Based on the severity of the injuries, Lieutenant Denton determined that a detective would be needed, and Detective Reed arrived at the scene at 12:46 a.m. Lieutenant Denton testified that the CAD report showed that Officer Ellis conducted a stop of the Defendant's vehicle at 12:42 a.m.

Sarah Howell, a Columbia Police Department officer, testified that she responded to a report that a male had been assaulted and thrown out of a vehicle at the Wayside Inn. When she arrived, she found an unconscious, white male lying face down. She noticed a large laceration on the back of the victim's head and blood coming from his ear. She felt for a pulse. When she could not discern a pulse, she and Lieutenant Denton turned the victim over to begin administering CPR. Officer Howell recalled that EMS and the fire department arrived as they were about to begin CPR and assumed medical care of the victim. She said that another officer searched the victim for identification but found none.

Jason Terlecki, a Columbia Police Department officer, testified that he responded to a call from the Wayside Inn. He said that he and Lieutenant Denton arrived at about the same time and that both men walked toward a motor home and found an unconscious, white male lying on the ground. Officer Terlecki searched the man for some form of identification but found none. He found a small knife in the victim's back pocket and "some money" in the man's right shirt pocket. Officer Terlecki also observed a capsule with various pills lying next to the victim's head.

Officer Scott McPherson, a Columbia Police Department officer, testified that, based upon the dispatch call about the BOLO for a "late ′90s model Cadillac," he conducted a felony stop of a vehicle the Defendant was driving on March 7, 2010. The officer testified consistently with his account of the events during the suppression hearing. Officer McPherson also identified the recording taken with the video camera in his vehicle. The State played the video for the jury

while Officer McPherson narrated. Officer McPherson recalled that both the Defendant and his passenger, Kelley, exited the car through the driver's side door. Kelley told police that the passenger side door would not open.

Officer McPherson said that, while the Defendant was in the back of the patrol car, he noticed the Defendant removing his shoes. On the video, there is an exchange between Officer Ellis and the Defendant during which Officer Ellis asks the Defendant why he removed his shoes, and the Defendant responds that the shoes were three sizes too big.

Officer McPherson testified that, after Detective Reed arrived, Detective Reed asked the Defendant for permission to search his vehicle. The Defendant responded that "he'd allow [Detective Reed] to search as long as he went up there with [Detective Reed]." Officer McPherson testified that he participated in the search of the vehicle and found a size 13 shoe with blood on it. At the time, the Defendant was standing approximately ten to fifteen feet away from Officer McPherson. The Defendant was returned to the back seat of the police car. He was in the vehicle alone but a microphone that Officer McPherson had earlier placed in the car was still recording. On the video recording, the Defendant made a statement. Officer McPherson said that, "[The Defendant] said that nobody had done nothing, it was a dog that cut his leg that bled all over that shoe."

Officer Steve Ellis, a Columbia Police Department officer, testified that he participated in the investigation involving the Defendant on the night of March 6, 2010. Officer Ellis's testimony was consistent with his testimony at the suppression hearing regarding the events of that night. Officer Ellis testified that he had known the Defendant for many years and recognized the description of the vehicle issued in the BOLO as similar to the Defendant's vehicle. Officer Ellis drove by the Defendant's residence, and the Defendant drove up while Officer Ellis was still on the street. Officer Ellis and Officer McPherson conducted a felony stop and detained the Defendant and Kelley in separate police vehicles.

Officer Ellis testified that the Defendant repeatedly asked the officer why he had been stopped and what was "going on." Officer Ellis told the Defendant that a detective was on the way and that if there was anything the Defendant wanted to talk about, now would be a good time. Officer Ellis said the Defendant hesitated and then asked, "is he dead?" Officer Ellis told the Defendant he did not know. Officer McPherson

then placed a recording device inside the car, and the Defendant "clammed up at that point." Officer Ellis recalled that Detective Reed arrived soon thereafter and questioned the Defendant and Kelley. Officer Ellis stated that the Defendant never admitted to him any involvement in the incident at the Wayside Inn.

Officer Ellis testified that the Defendant removed his shoes while in the back seat of the police car. When asked about his removal of his shoes, the Defendant said the shoes were too big. Officer Ellis stated that, while waiting for Detective Reed to arrive, he took the Defendant out of the back seat of the police car twice to "use the restroom." Officer Ellis accompanied the Defendant at all times while outside the vehicle and never observed the Defendant drop or throw anything.

After leaving the scene of the stop, Officer Ellis drove the Defendant to the detectives' office. After they arrived, the Defendant indicated he needed to go the bathroom "bad." Officer Ellis interpreted this to mean that the Defendant needed to have a bowel movement. Based on this comment, Officer Ellis took off the Defendant's handcuffs and let him go inside the bathroom alone. The Defendant had been searched for weapons but had not yet been strip-searched. After several minutes, the Defendant emerged from the bathroom, and Officer Ellis handcuffed him and took him back to the lobby. Officer Ellis said that he noticed "a considerable amount of water inside the bathroom" after the Defendant finished in the bathroom. He said that the Defendant "was agitated," so Officer Ellis thought the Defendant "maybe purposely made a mess."

On cross-examination, Officer Ellis testified that, after Officer McPherson advised the Defendant of his *Miranda* rights, he told the Defendant that police were investigating a possible homicide. Officer Ellis agreed that Officer McPherson informed the Defendant of the investigation before the Defendant asked Officer Ellis if the victim was dead.

Randy Blackburn testified that he worked as a plumber. He recalled that, on March 16, 2010, he worked at the Columbia detective's office unclogging a toilet in the men's bathroom. Blackburn said that he extracted an object from the toilet that appeared to be "personal items, man's name, like, insurance card or something like that, with Wayne Clemons on it." Based on its size, he initially thought the retrieved item was a calculator, approximately one half inch thick. He placed no significance on the item and because it was "dirty" he "tossed it in the trash can." Shortly thereafter, an employee came in to the bathroom and

- 9 -

asked about the clog. Blackburn indicated that he put the item in the trash can.

Jeremy Alsopp, a Columbia Police Department officer, testified that, in March 2010, the toilet in the men's restroom had not been operating correctly for approximately ten days when, on March 16, 2010, a plumber came to repair the toilet. Lieutenant Alsopp recalled that he was sitting at his desk when he overheard the plumber ask who was "Harold Clemons." Recognizing the victim's name, Lieutenant Alsopp got up from his desk and went to the doorway of the men's restroom. He saw an item in the toilet covered in feces. He retrieved gloves and removed the item from the toilet. He described the item as a "small black non-folding, clear covered wallet." He wiped it off with paper towels and saw an identification card with the victim's name and photograph on it. There were additional cards, such as prescription cards, behind it.

Mark Craig, a Columbia Police Department detective, testified that on March 7, 2010, his supervisor requested he assist with a search warrant for the Defendant's vehicle. Detective Craig said that the focus of the search was to collect DNA samples and fingerprints. Detective Craig identified photographs he had taken of the vehicle. Detective Craig identified a shoe and a tire tool that were removed from the Defendant's trunk. He said that the men's shoe taken from the trunk was a left, size 13 shoe. Inside the compartment of the vehicle, a camouflage wallet containing the Defendant's driver's license was found in the console area. The car registration, indicating the owner of the vehicle as the Defendant, was found in the glove box.

Detective Craig testified that, approximately eleven days after this initial search, Detective Reed asked him to check the operating condition of the vehicle's doors and windows. Detective Craig tested the doors and windows and found that the passenger side windows could not be opened, but all of the doors worked from the inside and the outside of the vehicle.

Andre Martin, a Columbia Police Department officer, testified that, on April 1, 2010, he went to Vanderbilt Medical Center and retrieved personal items found on the victim's person while he was treated at the hospital. From the hospital, Lieutenant Martin retrieved $31.10, and from the Vanderbilt Police Department, he retrieved the victim's pocket knife.

- 10 -

Jamie Reed, a Columbia Police Department detective, testified that he was assigned to investigate the case involving the Defendant. Sergeant Reed said that he was notified of the case shortly after midnight on March 7, 2010. He arrived at the scene approximately twenty-three minutes later where he was briefed by officers on the scene. He said that, at this time, the victim had already been transported to the hospital and the scene secured.

Sergeant Reed testified that, after surveying the scene, he determined that he would process the scene himself because it was a small area. Sergeant Reed photographed the crime scene and collected a pill container with loose pills found near the victim for analysis. DNA samples from the blood puddles were taken and also submitted for testing.

Sergeant Reed testified that, while processing the scene, he received information that a suspect vehicle had been stopped and the occupants detained. At this point, Sergeant Reed was "more than half way" through with his work at the scene, so he completed his work at the scene before proceeding to Bandywood Drive. Sergeant Reed talked with officers at the Bandywood Drive scene before talking to either suspect. After confirming with the Defendant that he had been advised of the *Miranda* rights, Sergeant Reed spoke with him. The Defendant agreed to allow police to search the vehicle if the Defendant would be permitted to stand next to Sergeant Reed and observe the search. Sergeant Reed agreed, and the Defendant stood next to the detective by the Cadillac while two other officers searched the vehicle. Officer McPherson walked over to Sergeant Reed and whispered in his ear that "there's a bloody shoe in the trunk." Immediately, the Defendant stated that he wanted to invoke his rights. The police officers ceased the search, and the Defendant was returned to the back of a police car.

Sergeant Reed testified that later, at the detective's office, he collected the Defendant's and Kelley's clothing and personal effects. He explained that he checked the Defendant's clothing for presumptive blood or DNA with chemical and lighting tests and that he did not find anything warranting further testing at the Tennessee Bureau of Investigation ("TBI"). Kelley's pants, however, appeared to have dried blood on them and were sent to the TBI for further testing. Sergeant Reed said that, after conducting preliminary testing on the tire tool found in the trunk of the Defendant's vehicle, he did not send the tire tool to the TBI for further testing. A cellular phone that was collected from Kelley at the time of the arrest was later determined to be the victim's

- 11 -

landlord's phone. Sergeant Reed said that the victim's clothing and belongings were also collected as evidence.

On cross-examination, Sergeant Reed confirmed that none of the clothing the Defendant wore at the time of arrest had blood on it. Sergeant Reed said that the Defendant's fingerprints were not found on any item collected in this case. The Defendant's DNA was not found on the victim's clothing, the bloody shoe found in the trunk of the Cadillac, or the pill container found lying near the victim. Sergeant Reed agreed that Kelley was over six feet tall and weighed approximately three hundred pounds while the Defendant was about five feet, five inches tall and weighed "100-some-odd pounds."

Brent Trotter, a TBI forensic scientist, testified as an expert witness in the field of forensic chemistry and analysis. Agent Trotter examined the pills in the plastic container found near the victim at the Wayside Inn. He determined that the pills were not controlled substances and were Motrin, Buspar, Flexeril, and Mevacor. Agent Trotter said that he tested "a loose pill" and determined that the pill contained Hydrocodone, a Schedule II drug.

Charles Hardy, a TBI forensic scientist, testified as an expert witness in the field of serology and DNA analysis. Agent Hardy testified that police provided him with DNA samples from the Defendant, Kelley, and the victim. He used the samples for comparison with items of evidence submitted in this case. He said that blood spatter found on the pill container matched the victim's DNA. Agent Hardy also took a sample from a blood stain found on the instep of a Nike shoe that was recovered from the Defendant's vehicle pursuant to a search warrant. The blood from the shoe matched the victim's DNA. A swabbing inside the shoe for epithelial cells produced a profile matching Kelley's DNA standard. Agent Hardy said that he took samples from two other areas inside the shoe but that the DNA was either insufficient or degraded.

Agent Hardy testified that he also tested a reddish-brown stain on Kelley's jeans. The DNA sample extracted from this stain matched the DNA sample for the victim. Agent Hardy also tested the blood stains on the shoe found in the trunk of the Defendant's vehicle during the consent search. The DNA profile matched the DNA sample for the victim. Agent Hardy said that he swabbed the inside of the shoe and the DNA profile obtained was consistent with a mixture of genetic material from at least two individuals. He said that Kelley was the major contributor of

the material and that neither the victim nor the Defendant could be excluded as the minor contributor to the mixture.

On cross-examination, Agent Hardy confirmed that none of the profiles obtained matched the Defendant's DNA profile.

Adele Lewis, a medical examiner, testified as an expert witness in the field of forensic pathology. After explaining an autopsy procedure to the jury, Dr. Lewis spoke specifically about her findings related to the victim's autopsy. Dr. Lewis said that the victim had multiple injuries to his head, two black eyes, and "bloody fluid" coming out of his nostrils and ears. The victim also had a patterned contusion or bruise on the lower portion of his back. She said that a "patterned contusion" is a bruise that "was left by an object that leaves a certain pattern." The pattern on the victim was two parallel purple lines. The victim also had further bruising on his arms and right thigh.

Dr. Lewis testified about the internal injuries the victim sustained. She said that she found extensive bruising on the left side of the victim's scalp and bruises on the brain. She noted a significant amount of swelling to the brain and a fracture at the base of his skull. Dr. Lewis found "bleeding over the surfaces of the brain and fractures of his third, fourth and sixth ribs." She explained that fractures to ribs are generally caused "by some sort of blunt force injury." Based upon the victim's injuries, Dr. Lewis estimated that the victim sustained multiple "blows." She also opined that a tire tool, like the one found in the Defendant's Cadillac, could have caused the skull fracture and the patterned bruising on the victim's back. Dr. Lewis testified that the cause of death was blunt force injury to the head and the manner of death was homicide.

Burnace McDonald testified that he first met the Defendant and Kelley in the Maury County jail waiting for transportation to court. McDonald explained that four or five days earlier, he had been charged with felony DUI. While waiting, the Defendant was seated next to McDonald, and Kelley was standing next to the Defendant. McDonald and the Defendant began conversing, and the Defendant told McDonald that he was in jail for assault. McDonald asked the Defendant if "he just kicked the man." The Defendant responded, "no, I got my licks in, too." McDonald said that he interpreted this to mean that the Defendant hit or punched the victim in addition to kicking him. The Defendant further told McDonald that he was "going to say he didn't get out of the car . . . because there was no sense in both of them getting in trouble for the same thing."

The State rested its case, and the Defense called co-defendant Marvin Wendell Kelley, Jr. to testify. In the absence of the jury, Kelley invoked his Fifth Amendment Right and refused to testify. His attorney explained that Kelley's case was being appealed, and, therefore, he had advised his client to invoke his rights.

Wes Bryant testified that he initially represented the Defendant in general session court. He handled the Defendant's preliminary hearing held on March 17. The court dockets from that date reflect that Burnace McDonald was also scheduled to appear in court on March 17. Bryant recalled that the courtroom was "packed" on March 17, and therefore, he had no recollection of whether McDonald was in the courtroom during the Defendant's hearing.

Linda Orr, the Defendant's mother, testified that for Christmas in 2009, she gave her son a pair of size nine tennis shoes.

*Christopher Michael Hooten*, 2013 WL 5436712, at *3-11.

Based upon this proof, Petitioner was convicted of first degree premeditated murder, first degree felony murder, aggravated robbery, and tampering with evidence. He received an effective life sentence which was affirmed by this court. *Id*. at *21.

**Error Coram Nobis and Post-Conviction Hearing**

Marvin Kelley, Jr. testified that he and Petitioner were both charged with the murder of the victim, Harold Wayne Clemons. Mr. Kelley invoked his Fifth Amendment right and refused to testify at Petitioner's trial. He said that Petitioner later wrote him a letter asking for his help, and Mr. Kelley contacted Petitioner's attorney. If Petitioner were granted a new trial and Mr. Kelley were called to testify, he would say that he was the person who beat the victim to death and that Petitioner was only present when the murder occurred, that Petitioner never placed his hands on the victim, and Petitioner did not plan the murder.

On cross-examination, Mr. Kelley testified that his statement that he wrote six years ago was the truth. In the statement, Mr. Kelley said that the victim pulled him out of the car and began hitting him, and Mr. Kelley acted in self-defense. However, Mr. Kelley admitted that he did not receive any injuries from the altercation. Mr. Kelley testified that it was a coincidence that he had the victim's cell phone is his pocket after the murder. He further testified: "I had it in my pocket because we was all right there and trying to get dope." Mr. Kelley admitted that he got into Petitioner's car with the victim's phone after the murder, and Petitioner drove them to Mr. Kelley's house. Mr. Kelley testified that he, rather than Petitioner, changed shoes at Mr. Kelley's house. He then placed the bloody pair of shoes in the trunk of Petitioner's car. Mr. Kelley denied

going through the victim's pockets after the murder, and he denied seeing the victim's wallet or his driver's license.

Mr. Kelley was aware that a witness, Mr. Reed, testified that he saw two men walking away from the dying victim, a large man and a smaller one. He did not recall if Mr. Reed testified that the victim's pockets were turned out. Mr. Kelley was aware of testimony at trial that the victim's wallet and identification were pulled from a toilet at the Columbia Police Department. Mr. Kelley admitted that he used the toilet, but he denied seeing the items or placing them in the toilet. Mr. Kelley then changed his testimony and said that he stole the victim's wallet and identification and flushed them down the toilet. He further admitted to lying under oath in court. Mr. Kelley then denied that he robbed the victim of his property. He said: "I'm guilty of murder. I'm not guilty of robbery." Mr. Kelley testified that he used the victim's cell phone because his phone was "dead," and he and the victim were arguing over "dope."

Mr. Kelley denied hearing Petitioner tell another inmate, Burnace McDonald, that Petitioner had also struck the victim. When asked if he and Defendant came up with the story while they were in jail, Mr. Kelley testified: I ain't cooked up nothing. I told the truth about it. I did it. I beat that man. He didn't lay a hand on him." Mr. Kelley testified that he hit the victim knocking him out and then got a tire iron and used it to hit the victim. Mr. Kelley said that Petitioner watched while he killed the victim and then drove Mr. Kelley away from the scene.

On redirect examination, Mr. Kelley testified that he had the victim's permission to use his cell phone. He said:

> We were riding around trying to get dope and my phone was dead. So, I had - - I was using his phone to call the dope man and I put it in my pocket. And a little later on, we got to - - we got to arguing and I told, you know, to pull over and, you know, we got to fighting.

Mr. Kelley testified that he never asked for Petitioner's assistance in concealing the crimes. Mr. Kelley admitted that he did not tell police that he had the victim's phone until someone else identified the phone. He further testified that he and the victim had been drinking whiskey and were very intoxicated when the fight broke out. Mr. Kelley testified that Petitioner was not involved in the fight.

On examination by the trial court, Mr. Kelley testified that he found the victim's wallet in the backseat of Petitioner's car after Mr. Kelley had beaten the victim and got back into the car. Mr. Kelley testified that he had been in the front passenger seat when they first arrived at the Wayside Inn, and the victim was in the backseat. Prior to that, they had all been at the Rebel Grill. Mr. Kelley agreed that the RV that Mr. Reed, the witness, had been living in was parked behind the Wayside Inn, and Petitioner pulled his

car in behind the Wayside Inn. He admitted that they pulled in behind the Wayside Inn so they would not be seen in order to beat up the victim. He said that he did not intend to kill the victim. Mr. Kelley testified that he went to his mother's house on Bandywood drive to change shoes and that Petitioner also lived in the house. Mr. Kelley testified that Petitioner never changed shoes. Mr. Kelley testified that he had the victim's wallet and identification at the police department and attempted to flush the items down the toilet. Mr. Kelley testified that he told police that the fight was between him and the victim, and Mr. Kelley was defending himself. He and Petitioner were transported to the police department in separate vehicles. Even though Mr. Kelley and Petitioner had access to the same bathroom, they never saw each other after they were arrested.

Mr. Kelley identified a letter that he sent to Petitioner's counsel on Petitioner's behalf. The letter was dated December 18, 2015.

Trial counsel testified that Petitioner was originally represented by another attorney but a conflict arose, and he was appointed to represent Petitioner after the suppression hearing. Trial counsel represented Petitioner pre-trial and through the trial and appellate process. Petitioner was out on bond before trial, and trial counsel met with him many times. Although trial counsel did not litigate the suppression motion, he was certain that he raised the issue in the motion for new trial and on appeal.

Trial counsel agreed that testimony from the suppression hearing indicated that there was a BOLO for a "maroon, square-body styled Cadillac occupied by two white males." At the suppression hearing, the trial court found that there was probable cause to arrest Petitioner and Mr. Kelley based upon the BOLO description and the totality of the stop. Trial counsel also agreed that the trial transcript indicated that a witness, Mr. Reed, testified that he saw one large and one small person at the Wayside Inn at the time of the murder and "that's all he could tell." There was no statement by Mr. Reed about the race of the two individuals. Trial counsel did not recall if he pointed out to the trial court at the motion for new trial that the description given by Mr. Reed was different from the description in the BOLO. Trial counsel agreed that the discrepancy was pertinent. When asked if he should have included the issue in Petitioner's motion for new trial, trial counsel said:

> Do I think it should have been included in my Motion For a New Trial? Again, I'm not sure what I included or what I argued in my Motion For a New Trial. Maybe my Motion For a New Trial had stronger arguments. I don't remember. I don't know what - - what I argued in my Motion For a New Trial.
>
> I think he had other arguments that were just as strong, if not stronger about Wendell Kelley's statements that I argued for - - that - - that should have granted him a Motion for a New Trial.

- 16 -

Trial counsel recalled having multiple conversations with Petitioner about whether or not Petitioner should testify at trial.  Trial counsel testified:

> I - - I don't recall what prior convictions that [Petitioner] had that could be potentially used against him, but there - - I believe there were some that could be brought up to - - to - - to be used against him, but which were a little bit concerning.  But I also do remember having conversation with him about his testimony.
>
> Now, I also, in response to the petition that was filed, I did go back and look at the - - the transcript to see what it was, the specific section in the transcript that you made reference to about a very brief conversation that was had.  I recall that and what happened was he and I didn't talk about *Momon* [*v. State*, 18 S.W.3d 152 (Tenn. 1999)], and why he would have to get up and explain to the Court why he did or did not want to testify.  I didn't explain that part of it.  But I did have multiple conversations with him about whether or not he wanted to testify and whether or not it would be a good idea for and what he wanted to do.

Trial counsel and Petitioner had a conversation that if Mr. Kelley's statement was not admitted at trial then "the only proof would be whatever the State put in, except for any testimony that we put in through our proof, and if he chose not to testify, then obviously, I wouldn't be able to - - to establish or to argue that it was a fight between Mr. Kelley and Mr. [Clemons]."  Trial counsel testified that Petitioner understood that he would not be permitted to present his version of the facts if he did not testify at trial and that trial counsel would not be able to present Petitioner's version of the facts during closing argument.

Trial counsel testified it was his recommendation that Petitioner not testify at trial because Petitioner had made some statements similar to what Mr. Kelley testified to earlier, that in trial counsel's mind, "that were - - from my perspective, it was a very circumstantial case and if [Petitioner] got on the stand, I'm afraid that the State would have - - it was my opinion that the State would have  - - been able to slam the door shut."  However, trial counsel testified that it was ultimately Petitioner's decision as to whether or not he testified.  He also said that Petitioner told him on more than one occasion that he did not want to testify.  Trial counsel testified that he did not always tell his clients about the "exact logistics of *Momon* and how they - - how the Judge does that."  He said that in all of his cases, "I make sure my client fully and adequately understands that it's his right to testify, and his right to - - to get on the stand and testify if he so chooses."

Trial counsel testified that he did not recall an argument at the motion for new trial about whether the victim was armed with a knife at the time of the murder.  Although he

knew of the "*Bland/Leach*" factors to show whether or not premeditation occurred, he was not familiar with them. Trial counsel admitted that Dawn Springer's testimony at trial was that the victim had a knife in his pocket on the way to Huck's Bar and Grill earlier on the evening of the murder. Concerning this issue, trial counsel testified:

> Well, actually, what I was arguing was that the - - I think in the Motion for New Trial, that - - that I was - - that the evidence was insufficient to convict [Petitioner] of premeditated first degree murder and felony murder. And so, I wasn't specifically focused solely on the *Bland/Leach* factors and wasn't solely focused on that specific factor a long time. But everything in the Motion for New Trial that I thought would benefit [Petitioner], and argued everything in the hearing that I thought would benefit [Petitioner].

Trial counsel agreed that the transcript of the motion for new trial hearing indicted that the State argued that "it has never been alleged that the victim in this case, Mr. Clemmons, was ever armed." Trial counsel further admitted that if the "State was arguing that he was - - he was not - - that he was unarmed, the State was wrong and I should have pointed that out to the Court."

On cross-examination, trial counsel testified that there was no proof that the victim ever displayed the knife while at the Wayside Inn or that it "went anywhere outside of that car with the [victim]." Trial counsel admitted that during his preparation for Petitioner's trial, he was able to read Mr. Kelley's statements, and he saw the videotape of the statement. He said that Mr. Kelley asserted a self-defense claim of a "mutual combat" type situation. Mr. Kelley never mentioned the victim using or displaying a knife.

Trial counsel agreed that the description of the suspects that was contained in the BOLO was transmitted to the officers from the dispatcher, not directly from the witness Mr. Reed. Trial counsel agreed that it was possible that Mr. Reed initially told the dispatcher that there were two white males. He recalled testimony at trial from Officer Ellis that upon hearing the BOLO, he thought of Defendant as the person who drove a car fitting the description in the BOLO, and he drove to the Bandywood Drive location where the stop of Petitioner's vehicle took place. Trial counsel agreed that he did everything within his power to get Mr. Kelley's statement before the jury, "but it was unavailable evidence."

Petitioner testified that trial counsel discussed the advantages and disadvantages of Petitioner testifying at trial. He said:

> We talked about it but it never was made 100 percent clear to me that my version, or my side of the story, wouldn't be heard unless I told it until

- 18 -

we was at the end and I asked him, are you going to tell my side? And he said, "Oh, you don't get to tell because you didn't take the stand." I mean, that's basically how it went. We - - he did tell me the advantages and dislikes [sic], they'd bring up my past records and stuff, but as far as my side of the story being told, I didn't know that it's never be brought up if I didn't tell it.

Petitioner also testified that he never told trial counsel his side of the story because they did not really discuss his case. He said that trial counsel told him that it would probably be "best" if Petitioner did not testify because of his past criminal record. He also said that trial counsel told him that "they really didn't have a good case." Concerning his discussions with trial counsel about testifying, Petitioner said: "Just went over by the office. He's asked me had I decided what I wanted to do and I told him I didn't want to testify and that was about it." Petitioner reiterated that trial counsel did not "make it clear to me about my side of the story not being able to be heard." He said:

That all that was heard was the D.A.'s side of the story, and nothing from my point was ever brought up because it couldn't be if I didn't take the stand. I didn't know that. I thought he'd be able to get back up there and go back over what, you know, my side was and told a different side of the story, it was all one-side, just what the D.A. had to say.

Petitioner claimed that if trial counsel had made him aware of this, he would have testified at trial.

Petitioner testified that trial counsel advised him that the trial court would ask him at the end of trial about whether or not he wanted to testify. He said that he and trial counsel were allowed to discuss the matter for a minute or two, and Petitioner "signed the paper and just handed it back." Petitioner thought that he signed a waiver concerning his testimony.

On cross-examination, Petitioner agreed that his side of the story would be a "mirror image" of what Mr. Kelley said. Petitioner indicated that he had nothing to do with the robbery and death of the victim but he agreed that he drove to the Wayside Inn and saw everything that happened. He then drove Mr. Kelley home where Mr. Kelley changed shoes and put the bloody shoes back in Petitioner's car. Petitioner recalled telling police that he thought it might have been dog's blood on the shoes.

Petitioner agreed that Mr. McDonald, an inmate, testified at trial that Petitioner told him that Petitioner got his "licks" in too on the victim and that Petitioner and Mr. Kelley had decided that there was "no sense in both of [them] going down for this, that [they] were just going to testify [Petitioner] stayed in the car."

- 19 -

Petitioner testified that he and trial counsel talked about whether Petitioner should testify at trial, and trial counsel told him that the State would bring up his prior convictions if he took the stand. Petitioner testified that his prior charges consisted of "[p]etty charges, like theft and DUI and stuff like that, never a violent crime against me in my whole life." Petitioner agreed that the jury would have heard about his felony drug conviction from Alabama and his theft convictions which would "probably not" have helped him at trial. Petitioner further agreed that he never asked the trial court if he would be able to tell his side of the story if he did not testify. He answered all of the trial court's questions during the *Momon* hearing and said that he understood everything.

*Analysis*

## I. Petition for Writ of Error Coram Nobis

We will refer to the trial court that heard the proceedings in the coram nobis and post-conviction matters as the post-conviction court. Petitioner argues that the post-conviction court erred by denying his petition for writ of error coram nobis by applying an incorrect legal standard. He also argues that Mr. Kelley's admission that he alone killed the victim may have changed the outcome of Petitioner's trial, and that the victim's wallet and identification were found in the back seat of Petitioner's car rather than being taken from the victim which changes the "likelihood of Petitioner's conviction for aggravated robbery."

A writ of error coram nobis is a very limited remedy which allows a petitioner the opportunity to present newly discovered evidence "which may have resulted in a different verdict if heard by the jury at trial." *Workman v. State*, 41 S.W.3d 100, 103 (Tenn.2001); *see also State v. Mixon*, 983 S.W.2d 661 (Tenn.1999). The remedy is limited "to matters that were not and could not be litigated on the trial of the case, on a motion for new trial, on appeal in the nature of a writ of error, on writ of error, or in a habeas proceeding." T.C.A. § 40-26-105. Examples of newly discovered evidence include a victim's recanted testimony or physical evidence which casts doubts on the guilt of the Petitioner. *Workman*, 41 S.W.3d at 101; *State v. Ratliff*, 71 S.W.3d 291 (Tenn. Crim. App. 2001); *State v. Hart*, 911 S.W.2d 371 (Tenn.Crim.App.1995). The supreme court has stated the following concerning the standard to be applied when a trial court reviews a petition for writ of error coram nobis:

> [T]he trial judge must first consider the newly discovered evidence and be "reasonably well satisfied" with its veracity. If the defendant is "without fault" in the sense that the exercise of reasonable diligence would not have led to a timely discovery of the new information, the trial judge must then consider both the evidence at trial and that offered at the coram nobis proceeding in order to determine whether the new evidence may have led to a different result.

- 20 -

*State v. Vasques*, 221 S.W.3d 514, 527 (Tenn. 2007). Whether to grant or deny a petition for writ of error coram nobis rests within the sound discretion of the trial court. *Id.* at 527-28.

A petition for writ of error coram nobis must be dismissed as untimely filed unless filed within one (1) year of the date on which the petitioner's judgment of conviction became final in the trial court. *Mixon*, 983 S.W.2d at 670. The only exception to this is when due process requires a tolling of the statute of limitations. *Workman*, 41 S.W.3d at 103.

Petitioner's motion for new trial was overruled by written order on April 17, 2012. The petition for writ of error coram nobis was not filed until October 24, 2016, more than three years after the one-year statute of limitations expired. Defendant asserts that the post-conviction court "did not dismiss Petitioner's writ based upon a statute of limitations argument." Defendant further states: "In fact, the State moved to dismiss Petitioner's writ based upon the statute of limitations, but the motion was only taken under advisement by the trial court." However, this does not change the fact that Petitioner's petition for writ of error coram nobis was filed late.

The record in this case does not implicate any due process concerns that may toll the one-year statute of limitations for a writ of error coram nobis. Accordingly, dismissal of the petition for error coram nobis relief was proper because it was filed outside the statute of limitations. However, even if the statute of limitations was tolled, Petitioner would not be entitled to relief.

The post-conviction court made the following conclusions in its order denying writ of error coram nobis and petition for post-conviction relief:

> [Petitioner] now contends that the testimony of his co-defendant, Wendell Marvin Kelley, was not available at trial because Mr. Kelley was appealing his conviction which had occurred in an earlier trial. Kelley's defense lawyer, who was handling Kelley's appeal, did not want Mr. Kelley taking sole responsibility for killing the victim in [Petitioner's] trial, because of the impact of such testimony upon a retrial of Mr. Kelley, if his appeal was successful.
>
> Mr. Kelley, whose appeal was unsuccessful, testified at the November 4 hearing that he alone beat the victim and caused the victim's death. Mr. Kelley said that [Petitioner] did not get out of the vehicle [Petitioner] was driving and did not strike the victim. Kelley acknowledged that [Petitioner] was present, saw the beating, drove the two of them from the

scene, and helped Kelley change from bloody shoes to non-bloody shoes. The bloody shoes were found in the trunk of [Petitioner's] car, when both men were arrested the same night that the victim was found in a seriously injured condition behind a tavern.

It is now the theory of [Petitioner] that the most [Petitioner] was guilty of with regard to the death of the victim was helping Mr. Kelley avoid arrest and prosecution, which at the most would be a class E felony offense of accessory after the fact. The State, on the other hand, impeached the credibility of Kelley and [Petitioner] and established that Kelley told several inconsistent pre-trial versions, while [Petitioner] never provided any pre-trial or trial version.

The inmate testifying against [Petitioner] at the trial accused [Petitioner] of saying that he "got his licks in" along with Mr. Kelley in the beating of the victim. The State argues that Kelley's current version of the events is not newly discovered evidence, because [Petitioner] observed the events and knew of Mr. Kelley's knowledge of the events, but was merely prevented from calling Mr. Kelley as a witness because of Mr. Kelley's exercise of his privileges against self-incrimination under the state and federal constitutions. The Court also notes that [Petitioner] could have testified at his trial about the same alleged facts that [Petitioner] now claims are true.

More importantly, the state's trial theory was that Kelley and [Petitioner] were with the victim at a different tavern earlier in the night and decided to rob the victim. In furtherance of their plan, [Petitioner] drove the three of them to the back of a different tavern, where one or both men beat the victim, took his wallet and cell phone, and left him to die. [Petitioner's] trial jury adopted the State's theory and found [Petitioner] guilty of felony murder. Therefore, the result of [Petitioner's] trial is the same even if [Petitioner] never touched the victim.

In seeking a new trial based on newly discovered evidence, the defendant must establish (1) reasonable diligence in attempting to discover the evidence; (2) the materiality of the evidence; and (3) that the evidence would likely change the result of the trial. *State v. Nichols*, 877 S.W.2d 722 (Tenn. 1994). In order to show reasonable diligence, the defendant must demonstrate that neither he nor his counsel had knowledge of the alleged newly discovered evidence prior to trial. *Jones v. State*, 452 S.W.2d 365 (Tenn. Crim. App. 1970).

In [Petitioner's] trial, he and his counsel knew that there was a Kelley video claiming [Petitioner] did not strike the victim. They tried to have that video played in [Petitioner's] trial, but the trial court found it inadmissible, which was affirmed on appeal. But, even if the video had been played, or if Kelley would have testified, the jury would have most likely still found [Petitioner] guilty of felony murder with an automatic life sentence. [Petitioner's] own testimony, if given at his trial, could have denied a plan to rob the victim and hopefully raised a reasonable doubt about his guilt of felony murder. The strategy of [Petitioner] and his trial counsel was reasonable and should not be judged by hindsight.

Petitioner contends that the post-conviction court used an incorrect legal standard to determine whether Mr. Kelley's testimony was considered newly discovered evidence. He argues that the post-conviction court improperly relied on *State v. Nichols*, 877 S.W.2d 722 (Tenn. 1994) and stated that "if Kelley had testified, the jury would have *most likely* still found [Petitioner] guilty of felony murder with an automatic life sentence." Petitioner contends that the "trial court should have analyzed whether Mr. Kelley's admissions under oath that he alone was responsible for the killing of Harold Clemens [sic] *may have* changed the outcome of Petitioner's trial." *See Vasques*, 221 S.W.3d at 527. However, we do not necessarily find that the post-conviction court used an improper legal standard. In *State v. Hall*, 461 S.W.3d 469 (Tenn. 2015) the supreme court stated the following concerning the issue of granting a new trial based on newly discovered evidence:

> The burden of proof for the grant of coram nobis relief is indeed heavy. Trial courts are required to grant a new trial based on newly discovered evidence only if the defendant proves each of the following three requirements: (1) that he or she was reasonably diligent in seeking the evidence; (2) that the evidence is material; and (3) **that the evidence is likely to change the result of the trial**. *State v. Nichols*, 877 S.W.2d 722, 737 (Tenn. 1994) (citing *State v. Goswick*, 656 S.W.2d 355, 358-60 (Tenn. 1983)). Newly discovered evidence that is "merely cumulative or 'serves no other purpose than to contradict or impeach' does not warrant" coram nobis relief. *Wlodarz v. State*, 361 S.W.3d 490, 499 (Tenn. 2012) (quoting *State v. Hart*, 911 S.W.2d 371, 375 (Tenn. Crim. App. 1995)). Moreover, the credibility of the newly discovered evidence is of paramount importance to its consideration in a petition for writ of error coram nobis. This Court has held that
>
> > in a coram nobis proceeding, *the trial judge must first consider the newly discovered evidence and be "reasonably well satisfied" with its veracity*. If the defendant is "without fault" in the sense that the exercise of reasonable diligence would not have led to a timely

> discovery of the new information, the trial judge must then consider both the evidence at trial and that offered at the coram nobis proceeding in order to determine whether the new evidence *may have* led to a different result.

> *State v. Vasques*, 221 S.W.3d 514, 527 (Tenn. 2007) (first emphasis added); *see also State v. Bowers*, 77 S.W.3d 776, 784 (Tenn. Crim. App. 2001) ("An assessment of the witnesses' credibility by the trial court is *essential* in order for the trial court to determine **whether the evidence is likely to change the result of the trial**." (emphasis added)). The decision whether to grant coram nobis relief rests within the sound discretion of the trial court. *Harris v. State*, 301 S.W.3d 141, 144 (Tenn. 2010).

*Hall*, 461 S.W.3d at 495-96 (emphasis added in bold).

However, even if the post-conviction court used an incorrect legal standard, Petitioner is not entitled to relief. The post-conviction court's finding relative to the first prong of the *Vasques* inquiry was that Mr. Kelley's testimony was not credible because the State impeached the credibility of Petitioner and Mr. Kelley and established that Mr. Kelley told several inconsistent pre-trial versions of his story. We note that at trial, Petitioner sought to introduce Mr. Kelley's videotaped confession after Mr. Kelley asserted his Fifth Amendment right against self-incrimination and declined to testify. The following exchange then took place:

> The Court: [I]f you got to play the video recording of the interview of [ ] Kell[e]y by law enforcement officers, in which he made statements favorable to [the Defendant], and you did so under Rule 8.04, wouldn't the State also be able then to put on . . . testimony of Mr. Morgan, about what [ ] Kell[e]y said about the Defendant? Because [ ] Kell[e]y would be unavailable to the State as well as to the defendant.
> Defense: Yes. At that point, the . . . State could attack the declarant's . . . credibility.
> . . . .
> The Court: Now, which would be more prejudicial to [the Defendant], to put it all in or to leave it all out?
> Defense: Put it all in, that would definitely be more prejudicial to [the Defendant].

*Christopher Michael Hooten*, 2013 WL 5436712, at *15. The trial court went on to find that Mr. Kelley "had made 'too many different and inconsistent statements' for the trial court to find that the out-of-court declarations are reliable for purposes of admissibility."

- 24 -

*Id.* at \*14. On appeal, this court concluded that the excluded statements by Mr. Kelley were critical to the defendant. However, this court further concluded:

> Kelley's statements cast doubt on the Defendant's participation in the assault and robbery. As the trial court correctly pointed out, the statements, however, bear little indicia of reliability. They are uncorroborated statements by a co-defendant and are contradicted by another statement made by Kelley to a fellow inmate, in which he implicated the Defendant in the attack on the victim. The third factor is closely related to the second and also weighs against the Defendant. The hearsay rule serves an important interest in excluding testimony that is untrustworthy. *State v. Flood*, 219 S.W.3d 307, 319 (Tenn. 2007). "Out-of-court statements are traditionally excluded because they lack the conventional indicia of reliability: they are usually not made under oath or other circumstances that impress the speaker with the solemnity of his statements; the declarant's word is not subject to cross-examination; and he is not available in order that his demeanor and credibility may be assessed by the jury." *Chambers v. Mississippi*, 410 U.S. 284, 298, 93 S.Ct. 1038, 35 L.Ed.2d 297 (1973). Balancing these three factors, we conclude that, although the statements were critical to the defense, the Defendant's right to due process of law was not violated by their exclusion because the statements were insufficiently reliable, and the governmental interest supporting their exclusion was substantially important.

*Christopher Michael Hooten*, 2013 WL 5436712, at \*17.

At the error coram nobis/post-conviction hearing, Mr. Kelley admitted that he had lied under oath about whether he had taken the victim's wallet and identification. Mr. Kelly was aware of testimony at trial that the victim's wallet and identification were pulled from a toilet at the Columbia Police Department. At the error coram nobis/post-conviction hearing, Mr. Kelly admitted that he used the toilet, but he denied seeing the items or placing them in the toilet. Mr. Kelly then changed his testimony and said that he stole the victim's wallet and identification and flushed them down the toilet. Mr. Kelly then again changed his testimony and denied that he robbed the victim of his property. He said: "I'm guilty of murder. I'm not guilty of robbery." Mr. Kelly claimed that he found the wallet and identification in the back seat of Petitioner's car. Mr. Kelley denied hearing Petitioner tell another inmate, Burnace McDonald, that Petitioner also struck the victim. Mr. Kelley reiterated that he beat the victim, and Petitioner did not "lay a hand on him."

However, the proof at trial showed that Mr. Reed saw "two men, one 'large' and the other 'small' walking away from the dying victim and toward the burgundy Cadillac.

- 25 -

*Christopher Michael Hooten*, 2013 WL 543612, at *5. Furthermore, Mr. McDonald at trial testified that he was seated next to Petitioner and Mr. Kelley was standing beside of Petitioner in the Maury County Jail as they were waiting for transportation to court. He testified that he and Petitioner began conversing, and Petitioner said that he was in jail for assault. Mr. McDonald asked Petitioner if he "just kicked the man," and Petitioner said, "no, I got my licks in, too." Mr. McDonald testified that Petitioner also told him that Petitioner was going to say that he "didn't get out of the car . . . because there was no sense in both of them [Petitioner and Mr. Kelley] getting in trouble for the same thing."

The post-conviction court assessed Mr. Kelley's credibility and made a finding that the State impeached his credibility. "The assessment of witness credibility is entrusted to the sound discretion of the trial court." *Johnson v. State*, 370 S.W.3d 694, 700 (Tenn. 2011). Because the post-conviction court was not satisfied with the veracity of Petitioner's newly discovered evidence, the post-conviction court did not abuse its discretion by denying the petition on that basis, even though we conclude that the petition for error coram nobis relief should have been dismissed because it was untimely filed. Petitioner is not entitled to relief on this issue.

## II.    Ineffective Assistance of Counsel

Initially, we point out that Petitioner raises a stand-alone claim that "he was unconstitutionally denied his right to testify because his waiver of this right was not knowing" and that this court should "reverse his convictions based upon the denial of his right to testify in his own defense." However, as argued by the State, this issue should have been raised on direct appeal and is not cognizable as a post-conviction claim. "A post-conviction petition is not a vehicle to review errors of law as a substitute for direct appeal." *French v. State*, 824 S.W.2d 161, 163 (Tenn. 1992); *see* T.C.A. § 40-30-106(g) ("A ground for relief is waived if the petitioner personally or through an attorney failed to present it for determination in any proceeding before a court of competent jurisdiction in which the ground could have been presented . . ."); *Mario Deangelo Thomas v. State*, No. W2004-01704-CCA-R3-PC, 2005 WL 1669898, at *2 (Tenn. Crim. App. July 18, 2005)(Petitioner's free-standing claim of a *Momon* violation is waived).

Petitioner contends that his trial counsel was ineffective for failing to properly advise him concerning his right to testify, failing to effectively litigate a suppression issue, and failing to challenge the State's claim that the victim was unarmed.

To be granted post-conviction relief, a petitioner must establish that his conviction or sentence is void or voidable due to the abridgment of any constitutional right. T.C.A. § 40-30-103. The petitioner has the burden of proving the allegations of fact by clear and convincing evidence. *Id.* § 40-30-110(f); *Grindstaff v. State*, 297 S.W.3d 208, 216 (Tenn. 2009). "'Evidence is clear and convincing when there is no serious or substantial doubt about the correctness of the conclusions drawn from the evidence.'" *Grindstaff*, 297

S.W.3d at 216 (quoting *Hicks v. State*, 983 S.W.2d 240, 245 (Tenn. Crim. App. 1998)). Factual findings by the post-conviction court are conclusive on appeal unless the evidence preponderates against them. *Ward v. State*, 315 S.W.3d 461, 465 (Tenn. 2010). This court may not substitute its inferences for those drawn by the trial judge, and "questions concerning the credibility of witnesses, the weight and value to be given their testimony, and the factual issues raised by the evidence are to be resolved by the trial judge." *Henley v. State*, 960 S.W.2d 572, 579 (Tenn. 1997). Claims of ineffective assistance of counsel in post-conviction petitions are regarded as mixed questions of law and fact. *Grindstaff*, 297 S.W.3d at 216. Thus, our review is de novo with no presumption of correctness. *Pylant v. State*, 263 S.W.3d 854, 867-68 (Tenn. 2008) (citing *Finch v. State*, 226 S.W.3d 307, 315 (Tenn. 2007)).

The Sixth Amendment to the United States Constitution and article I, section 9 of the Tennessee Constitution guarantee the accused the right to effective assistance of counsel. To prevail on a claim for ineffective assistance, a petitioner must prove "that counsel's performance was deficient and that the deficiency prejudiced the defense." *Goad v. State*, 938 S.W.2d 363, 369 (Tenn. 1996) (citing *Strickland v. Washington*, 466 U.S. 668, 687 (1984)).

To demonstrate deficiency, a petitioner must show "'that counsel made errors so serious that counsel was not functioning as the "counsel" guaranteed the defendant by the Sixth Amendment.'" *Felts v. State*, 354 S.W.3d 266, 276 (Tenn. 2011) (quoting *Strickland*, 466 U.S. at 687). A petitioner "'must show that counsel's representation fell below an objective standard of reasonableness' guided by 'professional norms' prevailing at the time of trial." *Id.* (quoting *Strickland*, 466 U.S. at 688) (internal quotations omitted). On review, counsel's performance is not to be measured by "20-20 hindsight." *Id.* at 277. Instead, there is a "strong presumption that counsel's conduct falls within the wide range of reasonable professional assistance." *Id.* (citing *State v. Burns*, 6 S.W.3d 453, 462 (Tenn. 1999)). The court must presume that counsel's acts might be "sound trial strategy," and strategic decisions are "virtually unchangeable" when made after a thorough investigation. *Id.* (quoting *Strickland*, 466 U.S. at 689).

To establish prejudice, "a petitioner must establish 'a reasonable probability that, but for counsel's unprofessional errors, the results of the proceeding would have been different.'" *Id.* (quoting *Strickland*, 466 U.S. at 694). "A reasonable probability is a probability sufficient to undermine confidence in the outcome." *Id.* A petitioner must show that counsel's performance was so deficient that it deprived the petitioner "of a fair trial and called into question the reliability of the outcome." *Finch*, 226 S.W.3d at 316 (citing *Burns*, 6 S.W.3d at 463). "Failure to establish either deficient performance or prejudice necessarily precludes relief." *Felts*, 354 S.W.3d at 276.

*A. Failure to Properly Advise Petitioner Concerning his Right to Testify*

Petitioner contends that trial counsel failed to "effectively explain to the Petitioner that if the Petitioner did not testify, then trial counsel would be unable to present Petitioner's version of events during closing arguments." Concerning this issue, the post-conviction court made the following findings:

> Trial counsel's alleged failure to explain to the Petitioner that the Petitioner's version of the facts could not be addressed in closing arguments, if the Petitioner did not testify, is not established by the PCR evidence. Counsel specifically testified, and [Petitioner] agreed, that they had several discussions about the pros and cons of [Petitioner] testifying. Counsel's testimony about explaining to [Petitioner] that [Petitioner's] theory could not be argued in closing, without some evidence in the record to support such theory, is far more believable than any evidence or inference to the contrary. This Judge conducted a hearing with the Petitioner during the trial to ensure that he was aware that the decision of whether to testify was his. *Momon v. State*, 18 S.W.3d 152 (Tenn. 1999)). The Petitioner gave appropriate responses to the Court's questions and ensured that he understood his right to testify or to remain silent. The fact that trial counsel did not discuss with [Petitioner] the specific [*Momon*] case by name is not grounds for relief, so long as the pros and cons were adequately addressed with counsel and the court.

The record supports the trial court's findings. Trial counsel recalled having multiple conversations with Petitioner about whether or not Petitioner should testify at trial. Trial counsel and Petitioner had a conversation that if Mr. Kelley's statement was not admitted at trial then "the only proof would be whatever the State put in, except for any testimony that we put in through our proof, and if he chose not to testify, then obviously, I wouldn't be able to - - to establish or to argue that it was a fight between Mr. Kelley and Mr. [Clemons]." Trial counsel testified that Petitioner understood that he would not be permitted to present his version of the facts if he did not testify at trial and that trial counsel would not be able to present Petitioner's version of the facts during closing argument. Trial counsel testified that it was ultimately Petitioner's decision as to whether or not he testified. He also said that Petitioner told him on more than one occasion that he did not want to testify. Trial counsel testified that he did not always tell his clients about the "exact logistics of *Momon* and how they - - how the Judge does that." He said that in all of his cases, "I make sure my client fully and adequately understands that it's his right to testify, and his right to - - to get on the stand and testify if he so chooses." At the post-conviction hearing, Petitioner admitted that he never asked the trial court if he would be able to tell his side of the story if he did not testify. He answered all of the trial court's questions during the *Momon* hearing and said that he understood everything. Therefore, the post-conviction court properly found that Petitioner's claim was not established by the evidence presented at the post-conviction

hearing. Furthermore, the post-conviction court, specifically credited the testimony of trial counsel concerning this issue. Petitioner is not entitled to relief on this ground.

### B. Suppression Hearing

Next, Petitioner contends that trial counsel was ineffective for failure "to raise the discrepancy between the police BOLO description and the testimony provided at trial by the State's witness at either the Petitioner's motion for new trial or at the appellate level." As noted above, trial counsel did not represent Petitioner at the suppression hearing. The motion for new trial, while held at the trial court level, is an integral prerequisite for appeal of all issues for which a new trial is the requested relief. Tenn. R. App. P 3(e). We note that regarding claims of ineffective assistance on appeal, our supreme court has provided:

> Appellate counsel are not constitutionally required to raise every conceivable issue on appeal. Indeed, experienced advocates have long emphasized the importance of winnowing out weaker arguments on appeal and focusing on one central issue if possible, or at most a few key issues. The determination of which issues to raise on appeal is generally within appellate counsel's sound discretion. Therefore, appellate counsel's professional judgment with regard to which issues will best serve the appellant on appeal should be given considerable deference.

*Carpenter*, 126 S.W.3d at 887 (citing *King v. State*, 989 S.W.2d 319, 334 (Tenn. 1999); *Campbell*, 904 S.W.2d at 596-97). When a petitioner alleges that appellate counsel was deficient for failing to raise an issue on direct appeal, the reviewing court must determine the merits of that issue. *Id.* "Obviously, if an issue has no merit or is weak, then appellate counsel's performance will not be deficient if counsel fails to raise it." *Id.*

Concerning this issue the post-conviction court held:

> Failure of trial counsel to again challenge the search and seizure issues at trial or adequately argue such issues on appeal is not a meritorious PCR claim because that search issue was fully considered on the direct appeal and found by the appellate court to be without merit. The only difference in the search argument on appeal and now in this PCR is that trial counsel failed to challenge the BOLO (be on the lookout) dispatch for two "white" males, when the witness at the scene said at trial he saw two men walking from the area of the victim to a Cadillac, without mentioning the race or color of the males. This Court now assumes that the witness told officers that night that the men were white or that

officers made reasonable inferences based upon other information, such as an officer's recollection that [Petitioner] had a Cadillac like the one described. In any event, in the early morning hours of the arrest of [Petitioner] and Kelley in Columbia, there were probably no other two men on the streets in such a Cadillac.

Again the record supports the determination of the post-conviction court. Petitioner argues that while the BOLO identified the suspects as "white," Mr. Reed testified that he could not identify the race of the two men only that one was "large" and the other was "small." However, this discrepancy is immaterial to the suppression issue. Officer Scott McPherson testified that "based upon the dispatch call about the BOLO for a 'late '90s model Cadillac,' he conducted a felony stop of a vehicle that Defendant was driving on March 7, 2010." *Christopher Michael Hooten*, 2013 WL 5436712, at *6. Officer Steve Ellis testified that he had known Petitioner for many years and recognized the description of the car from the BOLO as being similar to that of Petitioner's car. "Officer Ellis drove by the Defendant's residence, and Defendant drove up while Officer Ellis was still on the street." He and Officer McPherson "conducted a felony stop and detained the Defendant and Kelley in separate police vehicles." *Id*. It appears from the record that Petitioner was stopped because of the description of the car rather than the race of the individuals driving the car. Trial counsel testified that Petitioner had other arguments at the suppression hearing "that were just as strong, if not stronger about Wendell Kelley's statements that I argued for - - that - - that should have granted him a Motion For a New Trial." As pointed out the by the State, "issues relating to the stop and subsequent search of [P]etitioner's vehicle were extensively litigated and 'fully considered' on direct appeal." Additionally, the post-conviction court specifically found that the "search issue was fully considered on the direct appeal and found by the appellate court to be without merit." *See Christopher Michael Hooten*, 2013 WL 5436712, at *11-13. We find that trial counsel's performance was not deficient nor has Petitioner shown that he was prejudiced by any alleged deficiency in trial counsel's performance. *See Vaughn v. State*, 202 S.W.3d 106. 120 (Tenn. 2006)(to show prejudice, the petitioner must show "that (1) the motion to suppress would have been granted and (2) there was a reasonable probability that the proceedings would have concluded differently if counsel had performed as suggested."). Petitioner is not entitled to relief on this issue.

### C. Failure to Challenge the State's Assertion that the Victim was Unarmed

Finally, Petitioner argues that trial counsel was ineffective for failing to challenge the State's assertion at trial that the victim was unarmed. More specifically, Petitioner argues that the "State made this allegation in an effort to bolster its arguments to the [jury] that Petitioner had committed pre-meditated murder. The State did this by claiming that the trial court was required to view Mr. [Clemon's] 'unarmed state,' as an enhancement factor un [sic] the *Bland-Leach* factors." We note, that the "*Bland-Leach*" factors refers to two leading cases that discuss the factors relevant to the issue of

premeditation. *See State v. Bland*, 958 S.W.2d 651, 659 (Tenn. 1997, and *State v. Leach*, 148 S.W.3d 52, 54 (Tenn. 2004).

Concerning this issue, the post-conviction court found:

Failure of trial counsel to emphasize that the victim was armed with a knife was a tactical or strategic decision that this Court will not second guess, especially since the unopened pocket knife was not used as a weapon. Besides, self-defense is available only if there was evidence that [Petitioner] was present and in reasonable fear of death or serious bodily injury. The Petitioner now wants this Court to believe that he did not even get out of the car at the scene of the victim's beating. Trial counsel's failure to make any trial issue of the victim's mere possession of a pocket knife is not a ground for post-conviction relief.

The record supports the trial court's findings on this issue. Although there was proof that the victim was carrying a small pocket knife at the time of the murder, there was absolutely no proof that the victim was "armed." The knife was found by an officer in the victim's back pocket after his murder. Trial counsel testified that there was no proof that the victim ever displayed the knife while at the Wayside Inn. Trial counsel admitted that during his preparation for Petitioner's trial, he was able to read Mr. Kelley's statements, and he saw the videotape of the statement. He said that Mr. Kelley asserted a self-defense claim of a "mutual combat" type situation. Mr. Kelley never mentioned the victim using or displaying a knife.

Again, we find that trial counsel's performance was not deficient nor has Petitioner shown that he was prejudiced by any alleged deficiency in trial counsel's performance. There were several factors in this case that supported a finding of premeditation besides whether the victim was unarmed. These included: the use of a deadly weapon, repeated blows resulting in multiple injuries, calmness after the killing, failing to render aid, the concealment of evidence, and motive. *Christopher Michael Hooten*, 2013 WL 5436712, at \*19. Petitioner is not entitled to relief on this issue.

## CONCLUSION

Based upon the foregoing authorities and reasoning, we affirm the post-conviction court's dismissal of the petition for writ of error coram nobis and the petition for post-conviction relief.

_____
THOMAS T. WOODALL, JUDGE